No. 30,838.

W. H. BROUGHTON, *Appellee*, v. THE KANSAS FLOUR MILLS CORPORATION, *Appellant*.

(18 P. 2d 120.)

Opinion filed January 28, 1933.

*Arthur Hurd,* of Abilene, *T. M. Lillard, Bruce Hurd* and *O. B. Eidson,* all of Topeka, for the appellant.

*S. S. Smith, Matt Guilfoyle* and *E. S. Crawford,* all of Abilene, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action for damages to crops on land belonging to the plaintiff damaged by flood water in 1927, alleged to have been caused by a dam maintained by defendant. Plaintiff recovered, and defendant has appealed.

The legislature, by the Laws of 1869 (ch. 46), as amended by the Laws of 1870 (ch. 64), authorized Christian Hoffman to construct and maintain a dam, not exceeding nine feet in height, across the Smoky Hill river: *"Provided, however,* That this act shall not be held or construed so as to relieve said Hoffman from being liable for any damage caused by the constructing or raising of said dam." The dam was constructed near Enterprise. Defendant is the successor

in interest of Christian Hoffman. Several actions involving this dam, or damages alleged to have been caused by it, have been determined by this court. (*Arnold v. Milling Co.*, 86 Kan. 12, 119 Pac. 373; 93 Kan. 54, 143 Pac. 413; *State, ex rel., v. Flour Mills Co.*, 100 Kan. 425, 164 Pac. 1170; *Feighley v. Milling Co.*, 100 Kan. 430, 165 Pac. 276; *Whitehair v. Kansas Flour Mills Corp.*, 127 Kan. 877, 275 Pac. 190.)

By these statutes and decisions two points pertinent to this case have been determined. *First,* that defendant may maintain the dam at its height at the time the damages claimed in this action are alleged to have accrued. *Second,* that defendant's right to maintain the dam does not relieve it from damages caused by such maintenance.

Plaintiff's farm on which the crops are alleged to have been destroyed is west and upstream from the dam, about three miles by direct line, about six miles by the thread of the stream. East of defendant's dam, less than a quarter of a mile, is the Santa Fe Railroad bridge across the Smoky Hill river. West of the dam, about a quarter of a mile, is a highway bridge spoken of as the Enterprise bridge. West of the dam, about three miles by the stream, is the Rock Island Railroad bridge. West of the dam, about six miles by the stream, is a highway bridge known as the Kyle bridge, and west of the dam, about ten miles by the stream, is a dam near Abilene spoken of as the Brown dam. Plaintiff's farm is near the river, about a half mile to a mile west of the Kyle bridge. It consists of about 160 acres and is spoken of as an island, from the fact that the river swung around to the west, north and east of it, but a few years ago a channel was cut across the south so that the farm is surrounded by the old and new river channels. Because of the shorter distance, perhaps most of the water passes to the south, but some of it follows the north channel. The farm has on it three depressions, spoken of as sloughs, where the surface is lower than at other places on the farm. One of these is so low that it quite frequently is covered with water, and plaintiff claims nothing by reason of damages there. Another has timber growing in it. Along to the north of plaintiff's land he had constructed a dike to keep the water of the river from coming onto his land and into the lower places on it where crops were grown.

There is no question here but that water was over most of plaintiff's land, and that it damaged his crops. The amount the jury

found the damages to be is not seriously questioned, if plaintiff is entitled to recover. The question to be determined was whether defendant's dam in any way caused the overflow of plaintiff's land and the damages to his crops. The defendant's principal contention was that at the time of the flood, in June, 1927, the water was so high from natural causes that its dam was "drowned out" or "flooded out," and that plaintiff's land would have been overflowed if its dam had not been in the river. Much of the evidence bore, directly or indirectly, on that question. There was evidence to the effect that the height of defendant's dam was such that when the pond of water caused by it was level with the top of the dam the backwater, or west end of the pond, was at the Brown dam, and that a lowering of the water at defendant's dam lowered this pond or body of water the entire distance to the Brown dam. A few weeks after the high water which caused damage to plaintiff's crops in June, 1927, observations were made and measurements taken of the height above sea level of the water at the crest of the flood at defendant's dam and at several other points. Witnesses for plaintiff and those for defendant had not always taken the observations or measurements at the same points, but when taken from the same points they did not materially differ.

By answers to special questions the jury found that the elevation above sea level of the crest of the flood at the Kyle bridge was 1,135.3 feet, at the Rock Island bridge 1,129.6 feet, at the Enterprise highway bridge 1,125.6 feet, at the upper side of defendant's milldam 1,124.3 feet, and at the Santa Fe bridge below the dam 1,123.8 feet; that the difference in the elevation of the crest of the flood at the upper side of the dam and the elevation at the Santa Fe bridge was approximately six inches; that the water which flooded plaintiff's land left the Smoky Hill river at several points; that the greatest depth at which it overflowed the banks at plaintiff's farm was from six to eight inches, and answered other questions as follows:

"9. Do you find that defendant's dam was in any way responsible for the flooding of the plaintiff's land? A. Yes.

"10. If your answer to the last question is 'yes,' how much did said dam increase the height of the flood water at the points where it flowed from the river onto plaintiff's land? A. We do not know."

Appellant correctly contends that the answer to question No. 10 is tantamount to "No." It argues that this defeats plaintiff's right

to recover, but with this we cannot agree. If defendant's dam caused the flooding of plaintiff's land, as the jury found in answer to question No. 9, that is all on that point plaintiff was required to prove. He was not required to go further and prove the exact depth of that flood.

Defendant moved to set aside the jury's answer to question No. 9 on the ground that it was inconsistent with the answers to the preceding questions. The motion was overruled, and complaint is made of the ruling. We do not understand it is ever a ground to set aside the answers to one or more special questions because they are inconsistent with the answers to other special questions. If it were permissible to do so counsel on the other side might ask to set aside the answers to the other questions as being inconsistent with that given to No. 9; so the court properly overruled that motion. Defendant then moved for judgment in its favor on the answers to the special questions notwithstanding the general verdict. This was overruled, and we think properly. The answer to question No. 9, if sustained by the evidence, required this ruling.

Appellant contends that the general verdict is not supported by the evidence and that the answer of the jury to special question No. 9 is contrary to the evidence. This is the principal question to be determined in this appeal. Appellant contends that it should be determined from the scientific evidence produced at the trial, most of which was in the form of depositions, and because of that this court must consider and weigh that evidence, as well as the trial court. The evidence relied upon by appellant on this point came from learned and experienced hydraulic engineers called by it, who testified as expert witnesses to this effect, that defendant's dam is classified as a low dam, that is, one constructed on a stream or at a place where the water flows over it, perhaps when the stream is at its normal stage, certainly at times of high water; that such a dam will be "drowned out" when the level of the water on the downstream side rises to the level of the water on the upstream side; that at the normal stage of the river the dam has the effect of raising the water on the upstream side, which is its purpose; that it has the more far-reaching effect in raising the water on the upstream side when the water is just level with the top of the dam; that the furthermost point upstream at which the water is so raised is called the limit of backwater; that the greatest fall at the dam is when the

water just trickles over the dam; that when the stream rises following a rain the limit of backwater approaches the dam and the fall of the dam becomes less because the water below the dam rises more rapidly than the water above it; that when the water in the stream gets so high that the water level below the dam is as high as the water level above the dam the limit of backwater has reached the dam itself and there is no backwater effect; that the dam is then "drowned out" and has ceased to be a perceptible influence upon the height of the water either above or below the dam. One of the expert witnesses for defendant used a chart to illustrate his testimony.

Appellant argues that this court should be impressed with the soundness of the physical laws applicable and the hydraulic principles demonstrated by the testimony and illustrations of its expert witnesses. The difficulty in this court taking that view is that learned and experienced hydraulic engineers called as witnesses for the plaintiff testified that the theory with respect to the limit of the backwater, as testified to by witnesses called by defendant, is fundamentally unsound. They testified that when the water in the river rises because of rains or floods the limit of the backwater caused by the dam recedes *upstream* from the dam; that in this case it could not recede farther than the Brown dam because that is an obstruction which would stop it. Their testimony is to the effect that when there is no flood and the pond caused by the dam is full so that the water is level, or practically so, with the top of the dam, there is little or no slope to the surface of the water. As the water rises the slope gradually increases above the dam and becomes more nearly the natural slope of the stream. As the amount of the water flowing increases, the slope necessarily increases, there is more current to the water, so that instead of the backwater effect extending for a shorter distance upstream for higher stages of the river it really extends a longer distance upstream than it does for low stages. So, on the point chiefly relied upon by appellant, there was a conflict of evidence. We cannot say the testimony of the experts called by plaintiff on this point is so fundamentally unsound as to be wholly discredited. In fact, it appeals to us as being more nearly correct. But since the evidence was in conflict it is not the function of this court to pass upon it. That was the proper function of the jury and the trial court. More than that, there was testimony bearing on this point other than

the depositions of expert witnesses. A number of witnesses testified to the backwater effect caused by the dam at various points upstream as far as the Brown dam. There was further testimony that many of the valley farms between defendant's dam and the Brown dam were flooded, while practically none of them was flooded below defendant's dam until the vicinity of Chapman, about ten miles, and there the flooding was not nearly so severe as it was above defendant's dam, although the general lay of the valley was the same.

The jury found, on conflicting evidence, that the difference in elevation above sea level on the crest of the flood at defendant's dam and at the Santa Fe Railroad bridge was approximately six inches. This finding tends to show that the water below the dam was almost as high as it was above the dam. The expert witnesses on both sides of the case agreed that the water of the river could get so high that the effect of the dam would be "drowned out," and some of them testified that condition would exist when there was no fall of the water at the dam. It is argued on behalf of appellant that, since the backwater effect of the dam approaches the dam as the water rises, it must have been very near the dam when the fall was only six inches, hence it could not extend up the river six miles or more to plaintiff's land. But since there was conflicting evidence on the limit of the backwater caused by the dam, and under some of the testimony the effect of the dam is more pronounced upstream than near the dam, we cannot say the finding of the jury that the fall at the dam was only six inches makes it impossible for the dam to have caused the flooding of plaintiff's land.

The result is that there is evidence to support the general verdict of the jury, and also to support the answer of the jury to special question No. 9.

One of the grounds of the motion for a new trial was that the answers returned by the jury to special questions are in conflict with each other. Where that is true a new trial should be granted. (*Willis v. Skinner,* 89 Kan. 145, 130 Pac. 673.) But the answers to special questions should be harmonized with each other and with the general verdict if that reasonably can be done. (*Bevens v. Smith,* 42 Kan. 250, 21 Pac. 1064; *Seeds v. Bridge Co.,* 68 Kan. 522, 75 Pac. 480; *Tarin v. Railway Co.,* 98 Kan. 605, 158 Pac. 874; *Moore v. Connelly,* 119 Kan. 35, 237 Pac. 900.)

Appellant contends the answer to special question No. 9 is in conflict with the answers to other special questions. The point is not well taken, as the above analysis discloses.

We find no error in the record. The judgment of the court below is affirmed.

THIELE, J., not participating.